FILED

2006 Sep-29  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **GINA WHITLOW** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil Action No. CV-04-S-2959-NE** |
| | ) |
| **BABCOCK & WILCOX** | ) |
| **CONSTRUCTION, INC.,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

Plaintiff, Gina Whitlow, commenced this action against two defendants:

Babcock & Wilcox Construction, Inc. ("Babcock"), her former employer, and Jimmy

Cone, an individual occupying the position of general foreman for Babcock. She

asserted claims against Babcock for hostile work environment sexual harassment, sex

discrimination, and constructive discharge pursuant to Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981a.[1]  She

---

[1]42 U.S.C. § 1981a provides, in pertinent part:

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704 or 717 of the Act [42 U.S.C.A. §§ 2000e-2, 2000e-3, or 2000e-16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by 706(g) of the Civil Rights Act of 1964, from the respondent.

also asserted supplemental state law claims for assault and battery, invasion of privacy, and negligent and/or wanton, hiring, supervision, training, and/or retention against both defendants.[2]  Plaintiff's claims against the individual defendant, Jimmy Cone, have been dismissed with prejudice, based upon the parties' joint stipulation of dismissal.[3]  The case presently is before the court on Babcock's motion for summary judgment,[4] and plaintiff's motion to strike the deposition errata sheets of Kevin Armstrong and Terry Jennings, witnesses who gave deposition testimony on behalf of Babcock.[5]  Upon consideration of the motion for summary judgment, the parties' briefs, and the evidentiary submissions, the court concludes the motion should be granted in part and denied in part.  The motion to strike will be denied as moot.

## PART ONE

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

42 U.S.C. § 1981a(a)(1).

[2]*See* doc. no. 1 (Complaint).

[3]*See* Order entered October 5, 2005.

[4]Doc. no. 37.

[5]Doc. no. 44.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART TWO

### *Statement of Facts*

**A.**   *Babcock and Wilcox Construction Company*

Defendant Babcock and Wilcox Construction Company ("Babcock") is an electric utility construction contractor.[6] Babcock hires craft laborers from local union hiring halls on a project basis. The craft laborers work at a specific job site and, although they are paid by Babcock for their work, and, are considered to be Babcock's employees, they are not carried on Babcock's *permanent* payroll.[7] Babcock began a job at the Miller Steam Plant operated by Alabama Power Company (the "Miller Plant") during July of 2003.[8] The project required certain work crews to work on the ground floor assembling ductwork, and other crews to install the ductwork inside the plant structure, approximately seven floors above the ground.[9]

Plaintiff, Gina Whitlow, began working with Babcock at the Miller Plant site on approximately January 2, 2004, as a boilermaker.[10] Plaintiff was a member of the local boilermaker's union, which arranged for her to take the job at the Miller Plant. She was considered an employee of Babcock, however, and Babcock paid her wages.[11] Plaintiff was the only female boilermaker employed at the Miller Plant site,

---

[6]Doc. no. 39 (defendant's evidentiary submission), Tab A (Affidavit of Eric Carlson), at ¶ 2.

[7]*Id.* at ¶ 4.

[8]*Id.* at ¶ 3.

[9]Carlson Affidavit, at ¶ 17; defendant's evidentiary submission, Tab B (Deposition of Gina Whitlow), at 153.

[10]Defendant's evidentiary submission, Tab B (Deposition of Gina Whitlow), at 150.

[11]Doc. no. 47 (plaintiff's evidentiary submission), Tab 12 (Deposition of Kevin Armstrong), at 65-66.

and her first assignment was to work on an installation crew.[12]  Her immediate supervisor was her foreman, Neville Bearden, who in turn reported directly to former defendant Jimmy Cone, the general foreman with authority over all installation crews.[13]  The other general foreman at the Miller Plant was Tom Posey, who supervised all assembly crews on the ground.[14]  All foremen and general foremen at the Miller Plant site were union members, and each was hired by Babcock, like plaintiff was hired, through the union.[15]  The general foremen divided work assignments among the foremen, assisted in managing work crews, ensured that foremen were doing their jobs properly, and made recommendations for selecting workers to become foremen.[16]  Neither foremen nor general foremen possessed authority to hire and fire employees.  Instead, they could only make a recommendation to Babcock's permanent managerial employees that a laborer be fired.[17]  Despite this limitation on the authority of general foremen, plaintiff and Cone both believed that a general foreman could terminate a laborer's employment.[18]

---

[12]Defendant's evidentiary submission, Tab G (Deposition of Tom Posey), at 119-20.

[13]Defendant's evidentiary submission, Tab D (Deposition of Jimmy Cone), at 172.

[14]Posey Deposition, at 111.

[15]Whitlow Deposition, at 227-28; Cone Deposition, at 10; Posey Deposition, at 10.

[16]Posey Deposition, at 75-75, 80; Cone Deposition, at 10, 118; defendant's evidentiary submission, Tab F (Deposition of Bruce Wilson), at 12-13.

[17]Posey Deposition, at 23, 129-30.

[18]Whitlow Deposition, at 103; Cone Deposition, at 57.

Bruce Wilson was the shop steward for the boilermakers union at the Miller Plant site.  In that capacity, he served as a mediator between the company and union laborers.[19]  Wilson also was an employee of Babcock, and he was paid by Babcock to conduct his union duties.[20]  In addition, Babcock maintained on its permanent payroll several supervisory employees who exercised authority over laborers at the Miller Plant.  Kevin Armstrong was the Lead Superintendent, and in that role he directed all lower superintendents and hired the boilermaker general foremen.[21]  Armstrong reported directly to Robert Back, the Project Manager.[22]  During the first month of plaintiff's employment, Mack Creech occupied the position of Safety Manager.  Terry Jennings took over as Safety Manager on February 2, 2004.[23]

**B.**     *Babcock's Anti-Harassment and Anti-Discrimination Policies and Reporting Procedures*

Babcock adopted several written policies addressing, directly or indirectly, the subjects of harassment and discrimination in the workplace.  The company's Discrimination and Harassment Policy states:

> Each individual has the right to work in an atmosphere that

---

[19]Wilson Deposition, at 10, 14; Cone Deposition, at 62.

[20]Wilson Deposition, at 10.

[21]Carlson Affidavit, at ¶ 10; Armstrong Deposition, at 11, 14.

[22]Armstrong Deposition, at 11.

[23]Carlson Affidavit, at ¶ 10; defendant's evidentiary submission, Tab E (Deposition of Terry Jennings), at 8.

promotes equal employment opportunities and prohibits discriminatory practices, including harassment. The Company expects all relationships among persons to be conducted in a manner that is free of bias, prejudice and harassment. The Company encourages reporting of all perceived incidents of discrimination or harassment. It is the policy of the Company to investigate all such reports. The Company prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports.[24]

Babcock's written policy also stated that the company

encourage[d] individuals who believe they are being subjected to harassment or discrimination to advise the offender that his or her behavior is unwelcome and request that the behavior be discontinued. Often this action alone will resolve the problem. The Company recognizes, however, that an individual may prefer to pursue the matter through formal complaint procedures. All perceived incidents of discrimination, harassment or retaliation should be reported, regardless of the offender's identity or position.[25]

In addition, Babcock represented that the company

thoroughly and promptly investigates all discrimination complaints. The Company encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken before relationships become irreparably strained. Reports of unlawful discrimination or harassment will be handled in accordance with the following steps.

**STEP ONE: (Notification)**

If for any reason an individual does not wish to address the offender directly, or if such direct discussion does not successfully end the offensive conduct, the individual should notify his/her immediate supervisor. In the event the supervisor is unavailable or is not an

---

[24]Whitlow Deposition, Exhibit 6, at document bearing Bates Stamp No. T00085.

[25]*Id.*

appropriate person to receive the report, the employee shall report the matter directly to the Company Labor Relations manager in Barberton, Ohio at (330) 860-6367 or (330) 860-6345l.

**STEP TWO: (Investigation)**

Both the employee who reports the matter and the alleged violator will be given an opportunity to explain the situation and present any evidence and/or the names of witnesses to support their positions. Confidentiality shall be maintained throughout the investigatory process to the extent consistent with adequate investigation and appropriate corrective action. Adequate steps will be taken to ensure that the employee making the complaint is protected from retaliation during the investigation.

**STEP THREE: (Report and Recommendation)**

The person conducting the investigation shall prepare a written report and recommendation immediately following the completion of the investigation. The report and recommendation should include:

- A summary of the complaint.
- A summary of the response by the individual charged with harassment.
- A summary of the statements and evidence obtained during the investigation.
- A finding of whether a violation of this policy did or did not occur and an explanation supporting the finding.
- A recommendation of disciplinary action, if appropriate.
- A recommendation as to the restoration of any employment terms, conditions, or opportunities the complainant might have lost as a result of the actions.

The complainant shall be informed of the results of the investigation and any decisions reached and actions taken.[26]

---

[26]Whitlow Deposition, Exhibit 6, at document bearing Bates Stamp No. T00085 (emphasis in original).

Babcock's written policy further represented that every employee found to violate the policy would be subject to "appropriate discipline," including "training, referral to counseling and/or disciplinary action such as warning, reprimand, withholding of a promotion or pay increase, reassignment, temporary suspension without pay, or termination."[27]  The policy also set forth the various responsibilities of employees and supervisors in handling harassment or discrimination complaints. The Manager of Labor Relations, for example, was responsible for overseeing compliance with the policy, including "[a]rranging training for employees," and "[e]nsuring a prompt response is made to an employee's complaints or inquiries regarding on-the-job discrimination."[28]  Supervisors were responsible for "[c]reating and maintaining a work environment that is free of discrimination and harassment," "[r]eporting discrimination and harassment complaints to the Company's Manager of Labor Relations," and "[t]aking corrective action to prevent prohibited conduct from recurring."[29]  Finally, employees who had been subject to harassment or discrimination were required to "[m]ake their unease and/or disapproval directly and immediately known to the harasser," and "[r]eport the incident in accordance with the

---

[27]*Id.*

[28]*Id.*

[29]*Id.*

procedures outlined in this policy."[30]

In addition to these policies, the Babcock Business Ethics and Conduct policy said, in part, that:

> The Company is committed to providing a workplace that is respectful to all employees and free from all forms of harassment. The Company expects that all relationships among persons in the work environment will be business-like and free of bias, prejudice, and harassment. The Company will not tolerate actions, comments, inappropriate physical contact, sexual advances or any other conduct that is intimidating or otherwise offensive or hostile. If you are aware of violations of this policy, you should report them to your supervisor, or to jobsite management, or to the Home Office Labor Relations Department in Barberton, Ohio.[31]

Further, Babcock's Job Site Work Rules provided, in part, that "[h]arassment of any nature, by any employee of [Babcock], will not be tolerated. Violation of this work rule may result in immediate discharge."[32] The Contractor Work Rules in effect at the Miller Plant site on the dates relevant to this action provided, in pertinent part, that "Alabama Power Company will not permit conduct or language derogatory to . . . gender . . ., including jokes, pranks, epithets, written or graphic material or hostility or aversion toward any individual or group."[33] An employee signing a copy of the Contractor Work Rules acknowledged that "violation of these rules may be followed

---

[30]*Id.*

[31]Whitlow Deposition, Exhibit 6, at document bearing Bates Stamp No. T00086.

[32]Whitlow Deposition, Exhibit 4, at document bearing Bates Stamp No. T00080.

[33]*Id.* at document bearing Bates Stamp No. T00081.

by [her] removal from Plant site and/or being barred from Southern Company properties."[34]

Plaintiff signed the face of the Job Site Work Rules and the Miller Plant Contractor Work Rules upon commencement of her employment.[35]  She does not specifically recall whether she ever *read* a copy of Babcock's Discrimination and Harassment Policy, or its Business Ethics and Conduct Policy,[36] but she did sign a form on January 2, 2004, acknowledging that she had received copies of those documents, as well as a copy of the Job Site Work Rules.[37]  Babcock routinely provided copies of all of these written policies to new hires during an orientation session, and also presented videotapes on the subject of harassment.[38]

Several of Babcock's supervisory employees related, through deposition testimony, their understanding of the anti-harassment and anti-discrimination policies, as well as their general practices in responding to harassment or other discrimination complaints.  Their testimony demonstrated utter confusion among those responsible for responding to harassment complaints.  For example, Bruce Wilson and Terry Jennings both testified that, when a woman was sexually harassed on the job at

---

[34]*Id.*

[35]*Id.* at documents bearing Bates Stamp Nos. T00080 & T00081.

[36]Whitlow Deposition, at 164-65.

[37]Whitlow Deposition, Exhibit 4, at document bearing Bates Stamp No. T000179.

[38]Whitlow Deposition, at 157-58.

Babcock, she was required to report the incident to her immediate foreman, or the general foreman, or the union shop steward.[39]  Kevin Armstrong acknowledged that a worker's immediate supervisor for purposes of reporting sexual harassment was her foreman, and that the union steward served as the "first line of command" between Babcock and its union employees.[40]  Tom Posey testified that a victim of harassment should have reported the conduct either to the union steward, or to "management."[41]  Bruce Wilson testified that when a union steward received a sexual harassment complaint, he was supposed to take the complaint to his supervisors, *i.e.,* a foreman or general foreman.[42]  Kevin Armstrong testified that, if a union steward receives a complaint, he should relay it directly to company management.[43]

Yet, boilermakers and other union workers at the Miller Plant were *discouraged* from dealing directly with Babcock's managerial employees.  Instead, the workers were encouraged to follow the "chain of command," by discussing any work issues or problems with their foreman, general foreman, or union steward, and allow the steward to communicate directly with Babcock management, if necessary.[44]

---

[39]Wilson Deposition, at 24; 112-13; Jennings Deposition, at 38, 80.

[40]Armstrong Deposition, at 66, 79.

[41]Posey Deposition, at 122.

[42]Wilson Deposition, at 25.

[43]Armstrong Deposition, at 26-27.

[44]Wilson Deposition, at 112-13; Jennings Deposition, at 40-41, 82.

Indeed, plaintiff testified that she understood that she never was supposed to voice any work problems or complaints directly to company management officials, because that would be "stepping outside the chain of command." She understood that, once a union steward or general foreman received a harassment complaint, it was *their* responsibility to convey the complaint to anyone within the company with a need to know about it.[45]

Babcock employees at the Miller Plant also received in-person harassment training from Craig Robinson (the Safety Supervisor from Babcock's corporate office) on January 27, 2004.[46]  The primary focus of Robinson's training was to emphasize the importance of reporting harassment.[47]  Robinson acknowledged that employees could go to their foreman or general foreman with harassment complaints, but he also encouraged employees to take complaints to the permanent supervisory employees of Babcock, including Bob Back, Kevin Armstrong, and Mack Creech (or Terry Jennings).[48]

Plaintiff testified that she never actually attended any training session conducted by Robinson, and she never received in-person training on the subject of

---

[45]Whitlow Affidavit, at ¶ 5.

[46]Defendant's evidentiary submission, Tab B (Declaration of Craig Robinson), at ¶¶ 1, 4.

[47]*Id.* at ¶ 6.

[48]*Id.* at ¶¶ 7-8.

sexual harassment, including the proper channels for reporting harassment.[49]

Specifically, no one ever instructed plaintiff to report sexual harassment to one of

Babcock's permanent management employees.[50]   Additionally, Jimmy Cone testified

that no one mentioned sexual harassment in the training he received from Babcock,

and he does not remember whether any of the training videos he viewed specifically

addressed the subject of sexual harassment.[51]

**C.**     *Jimmy Cone's Allegedly Harassing Behavior*

Plaintiff first met Jimmy Cone in 2003, while they both were working for a

different contractor at the Miller Plant site.[52]   During that time, plaintiff telephoned

Cone at his home to discuss problems she was having with a work-related injury.  She

thought Cone could give her advice on the matter because he previously had suffered

a work-related injury.[53]   Plaintiff and Cone spoke on the telephone several times, with

each initiating the calls on various occasions.  At some point, their conversations

became more personal, and they began discussing Cone's attempts to reconcile his

relationship with his former wife.  They also discussed a four-year affair plaintiff's

---

[49]Doc. no. 47 (plaintiff's evidentiary submission), Tab 1 (Affidavit of Gina Whitlow), at ¶ 1.

[50]Whitlow Affidavit, at ¶ 3.

[51]Cone Deposition, at 24, 180.

[52]Whitlow Deposition, at 100-01.

[53]*Id.* at 112-116.

husband had with plaintiff's mother, and the resulting difficulties in plaintiff's marriage.[54]

When plaintiff began working for Babcock in January of 2004, Cone was the general foreman over her work crew.  Approximately one week after plaintiff started the job, Cone began to engage in behavior that plaintiff found offensive.[55]  On approximately five occasions, Cone said to plaintiff, "Watching you down there working your ass sure looks good."[56]  On approximately two occasions, Cone told plaintiff that she "had big boobs."[57]  Cone commented "all the time" about different parts of plaintiff's anatomy, and how he wanted to touch her body parts,[58] and he repeatedly told plaintiff that he wanted to make love to her.[59]  Cone told plaintiff he wanted to put an Alka-Seltzer tablet inside of her, let it foam, and then lick it out.[60]  Further, Cone made all of the following comments on one occasion each: "Watching that ass made me get wet, I came all over myself.  I had to go to the bathroom and play with myself, if you know what I mean";[61] "I love that ass you've got";[62] and "I've

---

[54]*Id.* at 116-120.

[55]*Id.* at 183.

[56]*Id.* at 228-29.

[57]*Id.* at 238.

[58]*Id.* at 240-41.

[59]*Id.* at 237.

[60]*Id.* at 241-42.

[61]*Id.* at 235.

[62]*Id.* at 239-40.

got to have you."[63]  He later tried to apologize for his comment about going to the bathroom and "playing with himself" by placing a note in plaintiff's lunch box which stated, "I am sorry.  Don't be mad at me.  I told you I was a bad boy."[64]  Cone invited plaintiff to his house for drinks, but plaintiff wisely declined the invitation.[65]

Cone also touched plaintiff in ways she found offensive.  On one occasion, he put his hand between plaintiff's legs, and grabbed her leg and crotch.[66]  Plaintiff startled, backed up, and told Cone to stop it, but Cone only laughed and told her, "I can't help it.  I'm a bad boy."[67]  On another occasion, when plaintiff bent over to get a pair of gloves from a drawer, Cone grabbed her, pulled her into him, and "hunched" her from behind.  Plaintiff asked Cone to stop, but he only laughed.[68]  Cone constantly rubbed his body against plaintiff's, anytime he was close enough to do so.  Again, plaintiff asked Cone to stop, but he only laughed.[69]  On another occasion, Cone tried to kiss plaintiff, but she told him to stop, and stuck her head down in her coat to avoid him.  Plaintiff asked Cone why he was trying to kiss her, and he

---

[63]*Id.* at 240-41.

[64]*Id.* at 270-71; *see also* Whitlow Deposition, Exhibit 3 (Cone's notes).

[65]Cone Deposition, at 130.

[66]Whitlow Deposition, at 245, 253, 395-97.

[67]*Id.* at 246-47.

[68]*Id.* at 248, 252-53, 399.

[69]*Id.* at 249-50.

responded that he was "going to have her."[70]  After this incident, Cone left a note in plaintiff's lunch box that said, "Pretty Eyes, Nice Ass, but Little Balls."[71]

In addition to the two notes already mentioned, Cone also left plaintiff notes and cards in her lunch box stating the following, "In order to be my Valentine I ask that you do one thing — Me"; "Roses are Red Violets are Blue, Big Daddy wants to make love to you"; "That is one fine ass"; and "I missed you."[72]  Plaintiff received all of these notes while she was working under Cone's supervision as general foreman.[73]  Cone testified that the notes suggesting he wanted to make love to plaintiff were a "joke."[74]  He explained the "Pretty Eyes, Nice Ass, but Little Balls" note as meaning that plaintiff was a pretty girl who needed to toughen-up and "grow some balls," to avoid being "screwed over" on her welding test.[75]  He also contended that plaintiff left notes for him on several occasions.[76]  Cone admitted that he did not leave notes for any men on the jobsite, and that he did not tell any of the men they had a "fine ass," or suggest that he wanted to make love to them.[77]

---

[70]*Id.* at 254-55.

[71]*Id.* at 274; *see also* Whitlow Deposition, Exhibit 3 (Cone's notes).

[72]Whitlow Deposition, at 269-72; *see also id.* at Exhibit 3 (Cone's Notes).

[73]Whitlow Deposition, at 269-73.

[74]Cone Deposition, at 97, 120-21, 129.

[75]*Id.* at 106-18.

[76]*Id.* at 92.

[77]*Id.* at 93, 104-05, 128.

Cone also telephoned plaintiff at home, or on her cellular telephone, after work hours during the months of January and February, telling her he wanted to make love to her, that he missed seeing her all day, and that he was going to "have her."[78] Plaintiff asked Cone to stop calling her, but he only laughed, and did not cease his unwelcome intrusions.[79]

Plaintiff claims that she did nothing to encourage Cone's unwelcome, sexually harassing behavior.  Instead, she repeatedly asked him to leave her alone, told him he was sick and disgusting, walked away from him, and made it clear that she did not desire to become romantically involved with him.[80]  Plaintiff considered Cone's words and actions to be so upsetting, physically threatening, and humiliating that she cried at work and became physically ill.  She began to limit her contact with Cone as much as she could, and she took her breaks in a separate break room, in order to not be near him.[81]

**D.**   *Plaintiff's Harassment Complaints and Babcock's Response*

On each occasion that Cone made an offensive comment to plaintiff, she reported it to Tom Posey, the other general foreman over the boilermakers at the

---

[78]Whitlow Deposition, at 277-81, 284.

[79]Whitlow Deposition, at 281-82.

[80]Whitlow Deposition, at 235, 240, 270; Whitlow Affidavit, at ¶ 6.

[81]Whitlow Deposition, at 237, 332; Whitlow Affidavit, at ¶ 9.

Miller Plant.  Plaintiff testified that she chose to take her complaints to Posey because she was comfortable with him, and also because, as a general foreman, he was a supervisory employee on at least the same level of the Babcock hierarchy as Cone. Union steward Bruce Wilson overheard some, but not all, of the complaints plaintiff lodged with Posey.[82]  Plaintiff also reported the incidents involving physical touching to Posey.[83]  She reported the incident involving Cone's act of grabbing her crotch to Wilson as well.[84]  Plaintiff showed Posey the notes that Cone had left in her lunchbox, and told him that the notes had been very upsetting for her.[85]  She also showed the notes to Wilson on approximately February 20, 2004.[86]  Plaintiff also told Posey about the telephone calls she had received from Cone.[87]  Significantly, Bruce Wilson and Terry Jennings both testified that plaintiff's decision to report Cone's behavior to Posey, a general foreman, was the correct course of action.[88]

When plaintiff reported Cone's comments to Posey, he responded by saying that Cone was "sick," that Cone did "that kind of thing," that he (Posey) would "take

---

[82]Whitlow Deposition, at 229-31, 236, 238-43.

[83]*Id.* at 250-56.

[84]*Id.* at 251.

[85]*Id.* at 265-67.

[86]*Id.* at 267.

[87]*Id.* at 277-78.

[88]Wilson Deposition, at 109-10; Jennings Deposition, at 80.

care of it," or that plaintiff should just "try and ignore it."[89]  When plaintiff showed Posey the notes, Posey acted stunned, and said he would "take care of it."[90]  Despite Posey's assurances, Cone's conduct continued unabated.  Plaintiff confronted Posey about the fact that Cone had not ceased his offensive conduct, but Posey only continued to insist that he was "taking care of it," "dealing with it," or intended to bring the problem to the attention of Babcock's management personnel.[91]  Indeed, Posey testified that he did everything plaintiff asked him to do in response to her complaints, and that he put her in touch with the union steward each time she complained.[92]  Terry Jennings testified, however, that Posey should have immediately brought plaintiff's complaints to *his* attention, or to the attention of another management employee, and should not have addressed the problem himself.[93]

When Cone's conduct continued despite plaintiff's complaints to Posey, plaintiff decided to transfer out of Cone's crew.[94]  Plaintiff first asked Cone to transfer her to Posey's crew.[95]  She also made the same request of Posey and Wilson.[96]

---

[89]*Id.* at 234, 237-38.

[90]*Id.* at 266-67.

[91]*Id.* at 244-45.

[92]Posey Deposition, at 73, 83-84, 122-23.

[93]Jennings Deposition, at 43-46.

[94]Whitlow Deposition, at 170.

[95]*Id.* at 288.

[96]*Id.* at 171.

Three days passed without plaintiff being transferred, so she went to Posey's work area and told him she was there to stay.[97]  Plaintiff's transfer was officially effected on February 22, 2004.[98]

After plaintiff transferred to Posey's work area, Cone "stalked" plaintiff by following her, and staring at her.  He also touched her a few times, and he sometimes grabbed and rubbed his crotch as he stared at her.[99]  On March 17, 2004, Cone left a note in plaintiff's lunchbox telling her he wanted to have sex with her.  Plaintiff wadded up the note and threw it into the trash.[100]  Also in March of 2004, plaintiff went into the women's bathroom to get away from Cone, who had been following her and staring at her.  She was so upset over this incident that she cried.[101]  Cone testified that he came to plaintiff's work area because one of his foremen had a crew working there, and he had to visit the area at least twice each day to monitor that crew.[102]

Plaintiff complained to Posey about Cone "stalking" her, staring at her, and grabbing himself suggestively.[103]  She also went to Bruce Wilson on approximately March 7, 2004, to tell him about some of Cone's earlier behavior, including the notes,

---

[97]*Id.* at 288; Whitlow Affidavit, at ¶ 8.

[98]Whitlow Deposition, at 288.

[99]*Id.* at 258-61, 404-05.

[100]*Id.* at 263-64.

[101]*Id.* at 140-45.

[102]Cone Deposition, at 18-19.

[103]Whitlow Deposition, at 244, 259, 289-90.

the telephone calls, and the touching.[104]   Wilson and Posey met with Cone and

questioned him about his behavior that same day.[105]   Cone denied calling plaintiff on

the telephone and "hunching" her.  In response to plaintiff's other complaints, he said

only that he had been "just kidding."[106]  Wilson and Posey told Cone they would have

to confer with the company's management representatives to find out how to handle

the situation.[107]   Cone agreed to quit "joking" with plaintiff by leaving notes in her

lunch pail.[108]

On approximately March 12, 2004, plaintiff asked Wilson for help in getting

Cone to leave her alone, because he still was "stalking" her, and staring at her.[109]

Wilson, in turn, conferred with Project Manager Bob Back and Superintendent Kevin

Armstrong, to find out what plaintiff needed to do in order to pursue her complaint

against Cone, and what would happen if plaintiff filed a formal complaint.[110]  Wilson

did not specifically mention plaintiff's name in his conversation with Armstrong and

Back, but Armstrong and Back were able to determine from the context of the

---

[104]Wilson Deposition, at 33, 36-37.

[105]*Id.* at 33-35; Cone Deposition, at 147–51.

[106]Cone Deposition, at 150, 167-68; Wilson Deposition, at 33-37, 120.

[107]Cone Deposition, at 155.

[108]Wilson Deposition, at Exhibit 1 (Wilson's Statement).

[109]Wilson Deposition, at 40-41, 123, *see also id.* at Exhibit 1 (Wilson's Statement).

[110]Wilson Deposition, at 51-52.

conversation that Wilson was referring to plaintiff.[111]  After Wilson's conversation with Armstrong and Back, Wilson reported to plaintiff that she and/or Cone could be fired and barred from performing future work for Southern Company if she pursued a complaint.[112]  Armstrong later acknowledged that he told plaintiff that both she and Cone could be fired as a result of the investigation of a sexual harassment complaint, but he explained that would happen only if both parties were found guilty of sexual harassment.[113]

After hearing Wilson's statement that she could be fired for filing a sexual harassment complaint, plaintiff asked Wilson to question Cone about trying to kiss her, and his act of and "hunching" her from behind.[114]  Cone denied those allegations, and when Wilson informed plaintiff of Cone's denial on March 20, 2004, plaintiff demanded to meet with Babcock's managerial employees.[115]

On some unspecified date soon thereafter, plaintiff met with Kevin Armstrong, Bob Back, and Terry Jennings, and she described all of Cone's words and actions that she believed to constitute sexual harassment.[116]  Plaintiff also submitted a written

---

[111]Wilson Deposition, at 45, 49; Armstrong Deposition, at 39-40.

[112]*Id.*, Exhibit 1 (Wilson's statement), at 3.

[113]Armstrong Deposition, at 76.

[114]Wilson Deposition, at 57; Wilson Statement, at 2.

[115]Wilson Deposition, at 58-61; Wilson Statement, at 2.

[116]Whitlow Deposition, at 115-16.

statement to Armstrong, Back, and Jennings, relating that she had reported the harassment to Wilson.  The next day, she asked Jennings for permission to add to her statement that she also had reported Cone's behavior to Posey, but Jennings would not allow her to amend the statement.[117]

Armstrong, Back, and Jennings subsequently met with Cone to discuss plaintiff's complaints.[118]  Cone initially denied leaving plaintiff notes, or calling her on the telephone, but later admitted he had been lying.[119]  After the meeting, Cone was suspended without pay for three days, while Jennings conducted an investigation.[120]  Jennings interviewed the employees who had worked with plaintiff on both the upstairs crew, and the downstairs crew.[121]  Wilson sat in on the interviews in his capacity as union steward.[122]  None of the witnesses Jennings interviewed had observed Cone acting inappropriately, and some of the interviewees reported that plaintiff had made inappropriate comments to Cone.[123]

As a result of Jennings' investigation, Babcock management determined that

---

[117]*Id.* at 29-32, 290-92.

[118]Cone Deposition, at 159-60, 169; Wilson Deposition, at 134-35.

[119]Cone Deposition, at 91-92; 160-62.

[120]*Id.* at 161-63.

[121]Jennings Deposition, at 97-99.

[122]Wilson Deposition, at 62.

[123]Jennings Deposition, at 103-05; *id.* at Exhibit 2.

the interaction between plaintiff and Cone had been mutual.[124]  Both plaintiff and

Cone were found to be guilty of minor violations of company policy, including the

horseplay policy.[125]  Babcock ended Cone's suspension and brought him back to

work, but the company issued him the following disciplinary statement: "We feel

your behavior in this matter as a representative of our Company is unacceptable, and

any further infractions of these types of behaviors will result in further disciplinary

action including termination and ineligible [sic] for rehire with our Company."[126]

Babcock disciplined Cone, and not plaintiff, because, as general foreman, Cone was

a representative of the Company, and he was responsible for maintaining a higher

standard of professional conduct.[127]

Beck and Armstrong later shared with plaintiff the results of Jennings'

investigation, and they informed her that Cone would be returning to work from his

suspension.[128]  Armstrong also informed plaintiff that Cone would be kept mostly

separated from her, as Cone's work crews would be located on the upper levels of the

plant, and plaintiff's work crew would be located on the ground level.  However,

Armstrong acknowledged that Cone might occasionally come into contact with

---

[124]Jennings Deposition, at 30, 53-54; Armstrong Deposition, at 83.

[125]Armstrong Deposition, at 81-82.

[126]Cone Deposition, at 165; *id.* at Exhibit 1.

[127]Armstrong Deposition, at 121.

[128]Whitlow Deposition, at 220.

plaintiff, as one of his crews did perform some work on the ground level, near the area where plaintiff would be assigned.[129]  Plaintiff did not believe that this separation would prevent Cone from harassing her in the future, because Cone had continued to engage in allegedly harassing behavior even after she had been transferred to Posey's crew on the lower level.[130]  Plaintiff told Beck and Armstrong that she could not work on the same job site as Cone, and she asked for a layoff.[131]  She gave and signed the following written statement:  "I Gina Whitlow ask for a layoff on 3-24-04 because Jimmy Cone will be back on job site 3-25-04."[132]  Plaintiff believed that if she did not take a layoff, she would have been fired if she again reported Cone for harassment. She based this perception on Wilson's statement that both the complainant and the offender could be terminated as a result of an investigation into a sexual harassment complaint.[133]

During the course of her employment at Babcock, and her problems with Cone, plaintiff never called the hotline number set out in Babcock's Business and Ethics Policy, allegedly because she "wasn't sure who [she] would be talking to."  She also

---

[129]*Id.* at 220-21; Armstrong Deposition, at 83-85.

[130]Whitlow Affidavit, at ¶ 12.

[131]Whitlow Deposition, at 221.

[132]*Id.* at 298; *id.* at Exhibit 17.

[133]Whitlow Affidavit, at ¶ 14.

never called Babcock's home office to report Cone's harassment.[134]  She never filed a grievance against Cone with her union, and she never shared her complaints with anyone at Alabama Power Company.[135]

**E.**   *Allegedly Sexually Discriminatory Work Assignments*

During the time period when plaintiff worked under Cone's supervision as general foreman, she asked him several times if she could do welding work.  Cone always turned down her requests, saying that she could not weld until she took a welding test, and that she could not take the welding test until he decided to send her to take it.[136]  Further, on one occasion, Cone told plaintiff she could not weld because "[t]hat stuff is too hot for women to do."[137]  Plaintiff testified that she wanted to take the test to become certified in welding, because doing so would make her eligible for more work hours and better pay.[138]  Cone explained that the company had a strict procedure for choosing who could take the welding test, so gaining the ability to test was "tough."[139]

Additionally, after she transferred to Posey's work crew in February of 2004,

---

[134]Whitlow Deposition, at 231-32.

[135]*Id.* at 226, 313.

[136]Whitlow Deposition, at 172-77.

[137]*Id.* at 173.

[138]*Id.* at 106-07.

[139]Cone Deposition, at 111.

plaintiff complains of being required to spend many of her work hours picking up garbage and "fire-watching" (making sure nothing on the jobsite caught fire).[140] Plaintiff testified that she was "mainly" the only one assigned to pick up garbage, and that fire-watching "shouldn't be" the type of work assigned to a boilermaker.[141] Even so, Posey testified that picking up garbage and fire-watching were the duties of a boilermaker apprentice, the position plaintiff occupied,[142] and plaintiff confirmed that no other boilermaker on her crew had less experience than she did.[143] Male apprentices also were assigned fire-watching duties.[144] Indeed, plaintiff was given many assignments that were identical to assignments received by male boilermakers.[145]

## PART THREE

### Discussion

Plaintiff's complaint asserts federal claims against Babcock for sexual harassment, sex discrimination, and constructive discharge. The complaint also asserts state law claims against Babcock for assault and battery, invasion of privacy,

---

[140]Whitlow Deposition, at 171-72, 178.

[141]*Id.* at 302, 310.

[142]Posey Deposition, at 93.

[143]Whitlow Deposition, at 301.

[144]*Id.* at Exhibit 18.

[145]*Id.* at 300-307, 309-10; Exhibit 18.

and negligent/wanton hiring, supervision, training, and retention.

**A.**   *Sex Discrimination*

Plaintiff claims that Babcock discriminated against her on the basis of her sex with regard to training, job assignments, and other terms and conditions of employment.  Specifically, plaintiff alleges that Cone's refusal to allow her to take the welding test, and Posey's assignment of her to fire-watching and garbage pick-up duties, were discriminatory.  Defendant argues that plaintiff cannot meet her burden of proof on this claim.  Plaintiff offered no argument in response, and the court agrees with defendant's assertion.[146]

---

[146]Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).

To make out a prima face case of gender-based discrimination, plaintiff must show "that (1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; (3) [defendant] treated similarly situated employees outside of the protected class more favorably; and (4) [she] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (emphasis supplied) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)); *see also*, *e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).[147]

Plaintiff has produced no evidence that similarly-situated male boilermakers were treated more favorably than she was. Specifically, plaintiff has no evidence that male boilermaker apprentices were required to perform fire-watching or garbage pick-up duties any less frequently than she was, or that any male in her crew with the same level of experience was allowed to take the welding test. Accordingly, summary judgment is due to be granted on plaintiff's claim for gender-based discrimination.[148]

**B.**   *Hostile Work Environment Sexual Harassment*

---

[147]The court acknowledges Cone's comment that welding is "too hot for women to do," but this statement does not affect the court's analysis. Plaintiff has not asserted that she has direct evidence to support her claim for sex-based discrimination. Even if she had made such an assertion, Cone's lone (and ambiguous) comment would be insufficient to support the assertion.

[148]Because the court has found that plaintiff cannot support a prima facie case of gender-based discrimination, it need not consider defendant's alternate argument, that plaintiff failed to satisfy the administrative prerequisites to filing suit.

Plaintiff also claims that Cone's conduct and comments created a sexually hostile work environment.  To succeed on this claim, plaintiff must show that:  (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer responsible under a theory of either vicarious or direct liability.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

The first three elements of a *prima facie* case are not in dispute.  As a female, plaintiff belongs to a protected group.  *See Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.").  Further, plaintiff was subjected to sex-based comments and behavior that she found unwelcome.  Defendant argues, however, that the fourth and fifth elements have not been satisfied.

**1.**    *"Severe or pervasive"*

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective

and a subjective component.  To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993).  When evaluating the objective severity of offensive conduct, courts examine the totality of the circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson,* 234 F.3d at 509 (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  Nevertheless, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive.  *See, e.g., Faragher*, 524 U.S. at 788 (citations omitted).

Defendant contends that no reasonable person would have found plaintiff's working environment discriminatorily abusive.  However, defendant's argument is belied by its own summary of Cone's behavior:  *i.e.,* that Cone

(1) called [plaintiff] *several times* — after she had already initiated a

relationship where they regularly spoke with each other on the phone, (2) left her a Valentine's Card and *six* notes in her lunchbox, (3) made perhaps *sixteen* suggestive or sexual comments to her, (4) touched her on two occasions, (5) tried to kiss her on one occasion, and (6) walked around her and stared at her.[149]

All of these violations took place over approximately a two-month period. This court has never encountered such egregious behavior on the part of an offending employee in a sexual harassment case. No employee should be required to endure the constant barrage of sexually offensive comments, sexual touching, and intimidation that plaintiff alleges Cone inflicted upon her.

Thus, considering the evidence — as the court must — in the light most favorable to the non-moving party, the court readily concludes that Cone's behavior was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment. *Compare Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir. 2002) (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson,* 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza,* 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were insufficiently frequent), *Shepherd v.*

---

[149]Doc. no. 38 (defendant's brief in support of motion for summary judgment), at 33-34 (emphasis supplied).

*Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient).

As plaintiff has satisfied the first four elements of a hostile work environment claim, her claim will survive summary judgment, unless defendant can show that there is no basis for holding the company liable for the behavior of a supervisory employee.

**2.** *Employer liability*

Defendant asserts that it cannot be held liable for Cone's behavior, relying upon the affirmative defense announced by the Supreme Court in *Faragher v. Boca Raton,* 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998).

> The defense comprises two necessary elements:  (a) that the employer [*i*] exercised reasonable care to prevent and [*ii*] correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  And while proof that an employee failed to fulfill the corresponding obligation of reasonable

-34-

care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08; *see also Ellerth*, 524 U.S. at 765 (same); *Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1313 (11th Cir. 2001) (same).

"Both elements [of the affirmative defense] must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick*, 246 F.3d at 1313 (citations omitted).

A court's assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in *preventing* sexually harassing behavior. The court next directs its inquiry to whether the employee made reasonably sufficient use of available avenues to put the employer on notice of the problem. Finally, the court refocuses on the employer to determine whether the employer or its authorized agent, after receiving notice of the harassment, took adequate steps to abate it and prevent its recurrence.

*Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1369 (11th Cir. 1999) (Barkett, J., concurring) (emphasis in original).

  **a.**  *Prevention prong*

During the course of plaintiff's employment, Babcock espoused written policies addressing harassment in the workplace. These included Babock's Discrimination and Harassment Policy, its Business Ethics and Conduct Policy, and

-35-

its Job Site Work Rules, as well as the Contractor Work Rules issued by Alabama Power Company that governed persons working at the Miller Plant. Even so, the fact of a written policy does not, alone, satisfy the prevention prong of the first element. *See Frederick*, 246 F.3d at 1314 (holding that "an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden") (citing *Faragher*, 524 U.S. at 808 (denying an employer the affirmative defense, even though it had promulgated a written sexual harassment policy, because the employer had "entirely failed to disseminate [that] policy")).[150]

Rather, the employer must establish three facts: (1) that it has "promulgated an effective and comprehensive" anti-harassment policy, *Miller,* 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997)); (2) containing complaint procedures that are "'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor,'" *Faragher*, 524 U.S. at 806;[151] and (3) that the policy was

---

[150]*But see Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000), stating:

> When crafting the first prong of the *Faragher* affirmative defense which requires, in part, that the employer exercise reasonable care to prevent sexual harassment, the Supreme Court sought to give effect to Title VII's deterrent purpose. . . . Accordingly, *the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy*. . . . [Citations omitted; emphasis added.]

[151]In the textual passage to which this note is appended, the *Faragher* Court was quoting

"aggressively and thoroughly disseminated" to its employees.  *Miller*, 277 F.3d at

1279 (quoting *Farley*, 115 F.3d at 1154); *see also, e.g., Frederick*, 246 F.3d at 1314

(holding that an employer is "required to show that its sexual harassment policy was

effectively published, that it contained reasonable complaint procedures, and that it

contained no other fatal defect") (citing *Madray v. Publix Supermarkets, Inc.*, 208

F.3d 1290, 1298-99 (11th Cir. 2000)).

 The court concludes that some, but not all, of those factors are present with

regard to Babcock's policies.  Babcock has promulgated written policies addressing

harassment, identified the reasoning behind the policies, recited that employees are

encouraged to report harassment, and set forth the procedures for pursuing a

harassment complaint.  Further, the policies recite that an employee may take a

harassment complaint to the Company Labor Relations manager or to the jobsite

management team if the employee does not desire to share the complaint with her

immediate supervisor.

 Even so, the court concludes that genuine issues of material fact exist with

regard to whether the policies were *effective*, whether they were adequately

disseminated to Babcock's employees, and, most importantly, whether the policies

---

*EEOC Policy Guidance on Sexual Harassment*, 8 FEP Manual 405:6699 (March 19, 1990), and the
bracketed alteration was in the original.  *See also Ellerth*, 524 U.S. at 764, 118 S. Ct. at 2270 (noting
"EEOC's policy of encouraging the development of grievance procedures," and citing the same
publication).

were "aggressively" enforced. *Miller,* 277 F.3d at 1279.  Although plaintiff did sign

a form acknowledging that she received copies of the written policies, she testified

that she cannot recall whether she *read* the policies.  Genuine issues of material fact

also exist with regard to whether Babcock adequately trained its employees on the

terms of its policies.  Although Babcock offered testimony showing that it trains all

employees on the harassment policies, plaintiff produced evidence that neither she

nor Cone — the major players in this twisted and perverted story — received any in-

person training on the subject of harassment in the workplace.

Based on the foregoing, Babcock has not satisfied its burden of showing that

it exercised reasonable care to prevent harassment of its employees.

### b.   *Plaintiff's responsibilities*

Babcock also cannot show that plaintiff "unreasonably failed to take advantage

of any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise." *Faragher*, 524 U.S. at 807.  The Supreme Court has stated that,

> while proof that an employee failed to fulfill the corresponding
> obligation of reasonable care to avoid harm is not limited to showing an
> unreasonable failure to use any complaint procedure provided by the
> employer, demonstration of such failure will normally suffice to satisfy
> the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08; *see also Ellerth*, 524 U.S. at 765; *Frederick*, 246 F.3d

at 1314 (stating "an employer's showing that the plaintiff-employee failed to follow

-38-

its complaint procedures will often [but not always] be sufficient to satisfy its burden").

Here, Babcock's policies directed an employee, if possible, to first attempt to address her complaint directly with the harasser (a silly, if not perverse, requirement). If that step is not effective, the employee should next take the complaint to her immediate supervisor, to jobsite management, or to Babcock's home office Labor Relations Manager. Plaintiff first confronted Cone about his obnoxious behavior, but it did not cease. Plaintiff then repeatedly reported Cone's behavior to Tom Posey, and she later made reports to Bruce Wilson. Although neither Posey nor Wilson was plaintiff's immediate supervisor, it was reasonable under the circumstances for plaintiff to take her complaints to those individuals. *See Frederick*, 246 F.3d at 1314, 1315-16 (holding that a plaintiff need not comply exactly with the employer's complaint procedures if the deviation from procedure is reasonable under the circumstances). Plaintiff could not reasonably be expected to address her complaint to Cone himself, and it was not reasonable for her to take her complaint to her foreman, because the foreman would be in a position of lower authority than Cone. Although Posey was not plaintiff's *immediate* supervisor, he still was in a position of *some* supervisory authority over plaintiff. Wilson, as union steward, also was not in a direct supervisory position over plaintiff. Even so, union employees were

-39-

encouraged to address any complaints to the steward, rather than one of Babcock's permanent managerial employees.  Further, and importantly, Babcock's employees, including Wilson and Jennings, testified that it was proper for plaintiff to complain to Posey and Wilson.

Babcock asserts that plaintiff failed to take adequate measures to avoid harm, because she did not present her complaints to Babcock's permanent managerial employees until approximately two months after Cone's behavior began, and because she never called the toll-free telephone number to report the harassment to Babcock's home office.  These facts are irrelevant, because Babcock's policy only requires an employee to report harassment to a supervisor; it does not *require* a complaint to be lodged with upper management, nor is a call to the home office hotline a clear prerequisite.  Plaintiff cannot be held responsible for failing to follow a procedure that was not required by Babcock's policies. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 n.4 (11th Cir. 2000) (stating that a defendant's "employees need not act in a manner not required by [its] own policy").[152]

In summary, plaintiff has produced sufficient evidence to support each element of her claim for hostile work environment sexual harassment, and defendant has not

---

[152]As defendant cannot prove that it took reasonable care to prevent harm to its employees, or that plaintiff failed to take advantage of any available preventive or corrective measures, the court need consider the "correction prong" of the first element of the affirmative defense, *i.e.,* whether Babcock took effective remedial action in response to plaintiff's complaints.

produced sufficient evidence to support the affirmative defense that it cannot be held liable for Cone's harassing behavior.  Accordingly, summary judgment is due to be denied on plaintiff's sexual harassment claim.

**C.**   *Constructive Discharge*

Plaintiff also claims that she was constructively discharged from her employment with Babcock.[153]   "To successfully claim constructive discharge, a plaintiff must demonstrate that [her] working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'"   *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)); *see also, e.g., Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) (same).  When assessing constructive discharge claims, courts within the Eleventh Circuit "do not consider a plaintiff's subjective feelings about his employer's actions."  Rather, we determine whether "a reasonable person in [the plaintiff's] position would be compelled to resign."  *Doe v. Dekalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998) (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317

---

[153]Plaintiff did not assert a separately enumerated claim for constructive discharge in her complaint.  Nonetheless, in the fact section of her complaint, she states, "the plaintiff told Back that she had no choice but to take a layoff; therefore, she was constructively discharged."  Complaint, at ¶ 20.  Thus, construing the allegations of plaintiff's complaint in the light most favorable to her, the court will consider plaintiff's claim for constructive discharge.

(11th Cir. 1989)) (other citations omitted).  Additionally, a plaintiff "must do more

than merely show that she was subjected to actionable harassment," because "'[t]he

standard for proving constructive discharge is higher than the standard for proving

a hostile work environment.'" *Walton v. Johnson & Johnson Services, Inc.,* 347 F.3d

1272, 1282 (11th Cir. 2003) (citing *Hipp v. Liberty National Life Insurance Co.,* 252

F.3d 1208, 1231 (11th Cir. 2001)).

Plaintiff offered the following as the basis for her constructive discharge claim:

> [A]fter the defendant allegedly investigated Plaintiff's [harassment]
> complaint, the defendant informed Plaintiff that it had been determined
> that she had engaged in improper conduct with General Foreman Cone
> — Armstrong testified that when he met with Plaintiff "I believe we told
> her that we know there was something going on, but we have no proof
> of anything, but we know it involved both of them." . . . Remembering
> the defendant's initial response to her inquiry about sexual harassment
> being she could get fired for reporting it, Plaintiff realized Cone could
> continue sexually harassing her with impunity and because the
> defendant decided it was a mutual thing between them, she could get
> fired.  Plaintiff had already reported Cone to her general foreman and
> the sexual harassment continued, even after Plaintiff moved to a
> different area in the plant.  The defendant admitted that it would not be
> able to keep Plaintiff and Cone separate.  Knowing that Cone would
> continue to sexually harass her as he had done when she had previously
> reported him and realizing, in light of the defendant's conclusion that
> she and Cone had something going on, that reporting Cone for sexual
> harassment could cost her her job, Plaintiff had no option but to take a
> layoff.[154]

Despite these assertions, defendant argues that no reasonable person in

---

[154]Doc. no. 49 (plaintiff's corrected opposition to defendant's motion for summary judgment),
at 68-69 (citing Whitlow Affidavit, at ¶ 14).

plaintiff's position would have felt compelled to resign.  As defendant points out, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast."  *Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir. 1987) (emphasis in original).  In *Garner,* the plaintiff was reassigned to a lower position within a Wal-Mart store upon her return from maternity leave.  One day after she received notice of the reassignment, she quit her job, stating that it would have been too "embarrassing and frustrating" to work in her new position.  *Id.*  The Eleventh Circuit held that it was not reasonable for the plaintiff to quit within one day of receiving the reassignment, because she had no reason to assume that she could not later be transferred into a management position, and because she had not complained about the situation to the store manager and given him an opportunity to formulate a solution.  *Id.*

Whether the rule announced in *Garner* is applicable here admittedly is a close call, because plaintiff asked for a layoff immediately after learning that Cone would be allowed to return to work following his suspension, and she did not wait to see whether the discipline Cone received would effectively halt his harassing behavior. Even so, given the deeply disturbing, if not shocking, facts of this case, the court concludes that plaintiff's constructive discharge claim should be submitted to a jury. Construing the facts in the light most favorable to plaintiff, the non-moving party, she

endured Cone's vile and repugnant behavior for months.  She was so troubled by Cone's harassment that she lodged a complaint with Babcock's management, despite having been informed that she could be fired as a result of the investigation.  Babcock suspended Cone for three days, but then concluded that the interaction between plaintiff and Cone had been mutual, and brought Cone back to work.  Babcock tried to assure plaintiff that Cone would be separated from her in the future, but plaintiff did not take much comfort from those assurances, because Cone had continued to harass her even after her transfer to Posey's crew.  Plaintiff would have been afraid to lodge another harassment complaint if Cone's behavior had continued, because she had been told she could lose her job for doing so.  Therefore, in plaintiff's mind, she faced two horns of an impossible dilemma:  ask for a layoff, or continue to endure Cone's harassment *without the possibility of reporting it to management*, because if she did report it, she would be fired.  This is precisely the sort of situation a constructive discharge claim is designed to address.  *See Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir. 1982) ("[W]hen 'an employee involuntarily resigns in order to escape intolerable and illegal employment requirements' to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII.") (citations omitted).  Genuine issues of material fact exist with regard to whether plaintiff's assessment of

the situation was reasonable.  Accordingly, summary judgment will be denied on plaintiff's constructive discharge claim.[155]

**D.**   *State Law Claims*

Plaintiff has asserted supplemental state law claims for assault and battery; invasion of privacy; and negligent and/or wanton, hiring, supervision, training, and/or retention

**1.**   *Intentional tort claims*

Babcock argues that summary judgment must be granted on plaintiff's state law claims against it for assault and battery and invasion of privacy, because Babcock did not authorize, ratify, and/or condone Cone's tortious behavior.  Babcock also asserts that summary judgment must be granted on all intentional tort claims against Babcock that are based upon the theory of *respondeat superior*, because all underlying claims against Cone have been dismissed with prejudice.

**a.**   *Ratification*

"For [an employer] to become liable for the intentional torts of its

---

[155]Defendant argues that plaintiff's ability to claim backpay damages will be limited, because plaintiff failed to mitigate her damages.  Specifically, defendant claims that plaintiff declined substantially equivalent employment within days of her layoff.  Plaintiff did not offer any objection to defendant's argument on summary judgment and therefore abandoned any claim to backpay damages past the date she rejected substantially equivalent employment.  *See* note 146, *supra.*  Thus, at trial, plaintiff's backpay damages will be limited to the time period between the date of her layoff, and the date she rejected substantially equivalent employment.  The determination of these dates will be a task for the jury.

> agent, the plaintiff[] must offer evidence that [1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer] or [3] that [the employer] participated in, authorized, or ratified the wrongful acts."

*Potts v. BE & K Construction Co.,* 604 So. 2d 398, 400 (Ala. 1992) (bracketed alterations in original) (quoting *Joyner v. AAA Cooper Transportation,* 477 So.2d 364, 365 (Ala. 1985)).  Plaintiff does not assert that Cone's acts were in the line and scope of his employment with Babcock, or in the furtherance of Babcock's business. There also is no allegation that Babcock participated in Cone's conduct.  Thus, the relevant question is whether Babcock authorized or ratified Cone's wrongful acts.

To prove that Babcock ratified Cone's conduct, plaintiff must show that Babcock "either expressly adopted [Cone's] behavior or that it implicitly approved of it."  *Potts,* 604 So. 2d at 400.  Plaintiff may do so by demonstrating

> that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take "adequate" steps to remedy the situation.

*Id.*  The first two elements are not reasonably in dispute.  Thus, the success of plaintiff's ratification theory turns on whether Babcock took adequate steps to remedy the situation.

In the context of an employer's ratification of an employee's harassing

behavior, "adequate" steps are those which are "reasonably calculated to halt the harassment." *Potts,* 604 So. 2d at 401. Plaintiff argues that Babcock's steps were not "adequate" to stop Cone's harassment because "defendant, through General Foreman Posey, learned of Cone's . . . actions against plaintiff but took no action against him."[156] Plaintiff's assessment that Posey took *no* action against Cone is not entirely accurate. Posey initially discussed plaintiff's complaints with Bruce Wilson, and he attempted to "take care of" the situation himself. He also allowed plaintiff to transfer to his crew, away from Cone's work area. Additionally, when Cone's behavior continued even after plaintiff transferred, Posey and Wilson met with Cone to discuss the situation with him.

Even so, Cone's behavior *did* continue despite Posey's efforts. Defendant argues that none of Cone's behavior, after plaintiff transferred to Posey's crew, actually constituted an actionable tort. The evidence shows that, after plaintiff's transfer, Cone "stalked" plaintiff, stared at her, touched her inappropriately, grabbed and rubbed his crotch while looking at her, and left her a note telling her he wanted to have sex with her. The court concludes that these facts, construed in the light most favorable to plaintiff, *do* support tort claims for assault and battery, and invasion of

---

[156]Doc. no. 49, at 71.

privacy.[157]   As Cone continued to engage in tortious behavior despite Posey's involvement in the situation, genuine issues of material fact exist with regard to whether Posey's actions were reasonably calculated to halt Cone's harassment.  *See Potts,* 604 So. 2d at 401-02 ("Whether the disciplinary action taken by BE & K was adequate to stop Sanders from harassing Potts or other female employees of BE & K is a question off fact.  The effect of the length of time between when BE & K got knowledge of the conduct and when it took disciplinary action is for the jury to consider, and so is the severity of the disciplinary action as compared to the seriousness of the conduct.").  Accordingly, genuine issues of material fact also exist with regard to whether Babcock ratified Cone's tortious conduct.

    **b.**    *Respondeat superior*

---

[157]The tort of assault is defined in Alabama as

> an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (citations and internal quotation marks omitted). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (citing *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986)).

    An invasion of privacy claim based upon sexual harassment requires the court to consider "whether there was an offensive or objectionable prying or intrusion into the plaintiffs' private affairs or concerns." *Busby v. Truswal Systems Corp.,* 551 So. 2d 322, 324 (Ala. 1989).  The *Busby* court found an actionable claim for invasion of privacy when the offending employee touched the plaintiffs in an offensive manner, repeatedly made sexual comments to them, followed one of the plaintiffs at night, and stared at the plaintiff's sexual anatomy.  *Id.*

To the extent plaintiff relies upon a theory of *respondeat superior* to hold Babcock liable for Cone's actions, that claim fails, because all of plaintiff's claims against Cone have been dismissed with prejudice.[158]   Under Alabama law, "[a] dismissal with prejudice constitutes an adjudication on the merits that bars any subsequent litigation." *Barlow v. Liberty National Life Insurance Co.,* 708 So. 2d 168, 173 (Ala. Civ. App. 1997) (citing *Calhoun v. Pennsylvania Nat'l Mutual Casualty Ins. Co.,* 676 So. 2d 1332, 1334 (Ala. Civ. App. 1996)).   The Alabama Supreme Court has held that

> "'when [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of *respondeat superior*, a verdict in favor of the servant entitles the master to have the verdict against him set aside.'"

*Barlow,* 708 So. 2d at 173 (quoting *Larry Terry Contractors, Inc. v. Bogle,* 404 So. 2d 613, 614 (Ala. 1981) (in turn quoting *Louisville & N.R. Co. v. Maddox,* 236 Ala. 594, 600, 183 So. 849, 853 (1938))) (bracketed alterations in quote from *Barlow*).

Thus, when all tort claims against an agent or employee have been dismissed with prejudice, any claims against the principal or employer based upon a theory of *respondeat superior* also will be dismissed. *Barlow,* 708 So. 2d at 173. *See also Alfa Life Insurance Corp. v. Jackson,* 906 So. 2d 143, 154-55 (Ala. 2005).

---

[158]*See* order entered on October 5, 2005.

In summary, plaintiff cannot hold Babcock liable for Cone's torts under a theory of *respondeat superior*. She can, however, proceed on her claim that Babcock ratified Cone's conduct. Accordingly, summary judgment is due to be denied on plaintiff's intentional tort claims, insofar as she supports those claims with a ratification theory of liability.

**2.**    *Negligent and/or wanton hiring, supervision, training, and/or retention*

Plaintiff asserts that Babcock "negligently and/or wantonly hired and failed to adequately supervise, train and/or retained Cone which proximately caused the sexual harassment against the plaintiff."[159]   As a result, plaintiff suffered "great emotional distress," for which she seeks compensatory and punitive damages.[160]

**a.**    *Negligent training and supervision*

The Supreme Court of Alabama has defined the standards for proving a tort of negligent supervision in the following manner:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing

---

[159]Complaint, at ¶ 45.

[160]*Id.* at ¶ 46.

specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Big B, Inc. v. Cottingham,* 634 So. 2d 999, 1003 (Ala. 1993) (quoting *Lane v. Central Bank of Alabama, N.A.,* 425 So. 2d 1098, 1100 (Ala. 1983) (in turn quoting *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970))). The same principles apply to plaintiff's claim for negligent training. *See Zielke v. AmSouth Bank, N.A.,* 703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1996) ("After reviewing Alabama caselaw, we see no distinction between claims of wrongful supervision and claims of wrongful training. We, therefore, treat the cases addressing wrongful supervision as applicable to claims of wrongful training.").

Plaintiff asserts that

[t]he facts before this Court provide sufficient evidence to send Plaintiff's negligent hiring, supervision and retention claims to the jury because the defendant failed to supervise and monitor Cone. Despite Plaintiff's complaints against Cone and the notes she produced proving what he had done, the defendant's General Foreman took no action, continued [sic] to retain Cone allowing Cone to continue to sexually harass Plaintiff.[161]

---

[161]Doc. no. 49 (plaintiff's brief), at 73.

The court concludes plaintiff has produced sufficient evidence to create a genuine issue of material fact for the jury on this claim.

Babcock became aware of Cone's behavior, through Posey, as soon as plaintiff began to complain to Posey.  Posey took action to address the situation by discussing plaintiff's complaint with Cone, and by allowing plaintiff to transfer to work on his crew, away from Cone.  However, this action was ineffective to *completely* eliminate Cone's harassing behavior.  Even after plaintiff's transfer to Posey's crew, Cone "stalked" plaintiff, stared at her, touched her inappropriately, grabbed and rubbed his crotch while looking at her, and left her a note telling her he wanted to have sex with her.  *See Sears v. PHP of Alabama, Inc.,* No. 2:05CV304-ID, 2006 WL 932044, at *21 (M.D. Ala. April 10, 2006) (slip copy) (finding a jury question with regard to negligent training and supervision when the offending employee continued to engage in offensive behavior after being reprimanded by management and transferred off the plaintiff's shift, even though the offensive behavior was less frequent and less severe than before); *Machen v. Childersburg Bancorporation, Inc.,* 761 So. 2d 981, 987 (Ala. 1999).  Additionally, Cone does not remember receiving any in-person training on the subject of sexual harassment, and he cannot recall if any training video he watched addressed the subject.  *See Mills v. Wex-Tex Industries, Inc.,* 991 F. Supp. 1370, 1390-91 (M.D. Ala. 1997) (company's failure to train the offending employee

in the "human resources aspect of his position" supported a genuine issue of material fact with regard to negligent training); *Big B,* 634 So. 2d at 1003 (considering the failure of supervisors to review Big B's training manuals with the offending employee as one factor to support a negligent training and supervision claim).

Based on this evidence, a reasonable jury could conclude that, "had [Babcock] monitored and/or supervised the situation more carefully, [Cone] would not have repeated the acts of misconduct." *Sears,* 2006 WL 932044, at *21. Thus, a genuine issue of material fact exists with regard to whether Babcock was negligent in training and supervising Cone, and whether the negligence resulted in plaintiff being subjected to additional harassing behavior even after she transferred away from Cone's work crew.[162]  Babcock's motion for summary judgment on plaintiff's negligent training and/or supervision claim is due to be denied.

    **b.**   *Negligent hiring*

Courts evaluating negligent hiring claims have considered such factors as whether the employer performed a background check or otherwise evaluated the employee before hiring him, and whether the employer had knowledge of any prior incidents involving the hire. *See, e.g., Big B,* 634 So. 2d at 1003. Here, there is no evidence that, when Babcock hired Cone, it had any knowledge that he would be

---

[162]Posey's actions support a claim for negligence, although, as discussed above, they are not sufficient to show that Babcock ratified Cone's intentional torts.

likely to engage in harassing behavior, or that Babcock failed to exercise reasonable care to discover such knowledge. Accordingly, summary judgment is due to be granted on plaintiff's claim for negligent hiring.

      **c.**    *Negligent retention*

A negligent retention claim under Alabama law provides a remedy to an employee who is injured by another employee, when such injury proximately results from "the negligence of the employer in retaining [an incompetent or potentially dangerous employee] with knowledge of his incompetence and the danger incident to his retention." *McDuff v. Kurn,* 172 So. 886, 887 (Ala. 1937) (citations omitted). In other words, "[a]n employer 'must use due care to avoid the . . . retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons [with whom he will have contact at his place of employment].'" *Norman v. Southern Guaranty Insurance Co.,* 191 F. Supp. 2d 1321, 1337-38 (M.D. Ala. 2002) (quoting *Brown v. Vanity Fair Mills,* 277 So. 2d 893, 894 (Ala. 1973)). To recover, "a plaintiff must show breach of the employer's above duty and that such breach proximately caused the plaintiff's injury." *Norman,* 191 F. Supp. 2d at 1338 (citing *Brown,* 277 So. 2d at 894).

The evidence shows that Babcock became aware of Cone's behavior (and the resulting potential danger of harassment for plaintiff and other female employees)

when plaintiff first began to complain to Posey about Cone.  Posey decided to address the complaint by talking to Cone, and by allowing plaintiff to transfer to his crew, away from Cone.  He did not pass the complaints along to any higher-level supervisor, and Cone retained his job despite the complaints.  Even after plaintiff's transfer to Posey's crew, Cone "stalked" plaintiff, stared at her, touched her inappropriately, grabbed and rubbed his crotch while looking at her, and left her a note telling her he wanted to have sex with her.  A jury could conclude that all of these events occurred as a result of Babcock's retention of Cone's employment even after plaintiff's complaints to Posey.  *See Sears*, 2006 WL 932044 at *22 (finding a genuine issue of material fact on a negligent retention claim when the offending employee continued to engage in harassing behavior even after plaintiff complained to her immediate supervisor, and after the employee transferred off of plaintiff's work shift); *Mills,* 990 F. Supp. at 1390-91 (finding a genuine issue of material fact on a negligent retention claim when the offending employee continued to engage in harassing behavior even after the company met with him, warned him not to engage in future conduct, threatened to fire him if he did, and transferred him to another location); *Machen,* 761 So. 2d at 987 ("A jury could conclude had the [company] properly investigated the incident, they would not have allowed [the offending employee] to remain in a position where he could abuse his authority.").

Accordingly, summary judgment will be denied on plaintiff's claim for negligent retention.

> **d.** *Wantonness*

Plaintiff also alleges that Babcock was wanton in its hiring, training, supervision, and retention of Cone.

> In *Alfa Mutual Insurance Co. v. Roush,* 723 So. 2d 1250, 1256 (Ala. 1998), [the Alabama Supreme Court] stated: "To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." "Wantonness" is defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). In *Roush,* citing *Bozeman v. Central Bank of the South,* 646 So. 2d 601 (Ala. 1994), [the Alabama Supreme Court] described wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Roush,* 723 So. 2d at 1256.

*Machen*, 761 So. 2d at 987.

In the context of sexual harassment cases, the Alabama Supreme court has allowed a wantonness claim to proceed to the jury when the evidence showed that the employer *consciously* downplayed a prior incident of sexual harassment in order to retain the offending employee, knowing that doing so would likely give the offender an opportunity to harass again. *See Big B, Inc.,* 634 So. 2d at 1004. The court also reached a similar holding when the evidence demonstrated that the employer, a bank,

"consciously chose to minimize the situation" in order to protect the offending employee, who was the bank's president and Chief Operating Officer, and the brother of the bank's Chief Executive Officer. *Machen,* 761 So. 2d at 987-88.

Here, there is no evidence that Babcock consciously downplayed any prior misconduct by Cone, with knowledge that doing so would likely result in his harassment of plaintiff.   Plaintiff alleges that Cone "had a history of sexually harassing the females working for him."[163]  Plaintiff offers no evidence to support this assertion, other than her deposition testimony that Posey and Wilson told her that Cone "picks a female on every job[,] that he goes and harasses them, and they give in and have sex with him and then he fires them.  And then he goes all around and laughs about it to everybody."[164]  Plaintiff could not identify any of these women.

Plaintiff also supports her wantonness claim by alleging that Armstrong and Jennings were not properly trained in dealing with harassment complaints, and their lack of training resulted in plaintiff's suffering sexual harassment.  This argument supports a claim for *negligence,* but not a claim for wantonness.  Plaintiff also argues that Posey "knowingly allowed Cone to continue to sexually harass Plaintiff."[165] However, plaintiff offers no evidence that Posey *consciously* failed to stop Cone's

---

[163]Doc. no. 49 (plaintiff's brief), at 75.

[164]Whitlow Deposition, at 233.

[165]Doc. no. 49 (plaintiff's brief), at 75.

harassing behavior, while knowing that plaintiff would likely suffer sexual harassment as a result. Posey testified that he should have handled plaintiff's complaints differently, but his actions are more accurately characterized as negligence, not a conscious disregard of plaintiff's well-being.

In summary, plaintiff has produced no evidence to support a claim for wanton hiring, training, supervision, or retention. Summary judgment is due to be granted on that claim.

## PART FOUR

### *Conclusion*

In accordance with the foregoing, summary judgment is due to be granted on plaintiff's claims against Babcock for gender-based discrimination, negligent hiring, and wantonness. Summary judgment will be denied on plaintiff's claims for hostile work environment sexual harassment, constructive discharge, assault and battery, invasion of privacy, and negligent training, supervision, and retention. An appropriate order will be entered contemporaneously herewith.

DONE this 29th day of September, 2006.

_____
United States District Judge